# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| CEATS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 2:15-CV-01470-JRG-RSP |
| | § | |
| TICKETNETWORK, INC. and | § | |
| TICKET SOFTWARE, LLC, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is CEATS, Inc.'s Motion for Leave to Serve the Supplemental Expert Report of Robert McSorley [Dkt. # 160]. Defendants TicketNetwork, Inc. and Ticket Software, LLC (together, "TicketNetwork") only oppose the motion with respect to Sections 9 and 11 of the report, which TicketNetwork contends constitute improper surrebuttal.

After considering the parties' briefing, the Court will **GRANT** the motion **IN PART**. Specifically, the Court will **GRANT** the motion *except* as to Section 9 and some portions of Section 11.

## I.  BACKGROUND

TicketNetwork's business comprises four components. First, it markets ticket inventory owned by others directly to end users through internally owned and operated websites, such as TicketNetwork.com and TicketLiquidator.com. Kruse Decl. (Oct. 27,

2017) [Dkt. # 112-28] ¶ 4. Second, it licenses a range of products and services to independently owned, operated, and controlled third-party ticket marketers. *Id.* ¶ 5. Third, it operates a backend ticket exchange whereby ticket brokers exchange ticket inventory with one another. *Id.* ¶ 6. Fourth, it operates a call center for its internal and third-party websites for facilitating purchases by end users. *Id.* ¶ 9.

In 2010, CEATS sued TicketNetwork for patent infringement. The parties settled mid-trial and later executed a license agreement concerning 16 of CEATS's patents. Settlement & License Agreement for CEATS Patents (Mar. 28, 2012) [Dkt. # 38-5] (hereafter, "the Agreement").

This lawsuit concerns TicketNetwork's alleged breach of the Agreement. CEATS contends TicketNetwork has not performed its obligation under Paragraph 5.2 of the Agreement to pay CEATS $0.50 for each "Transaction," which is "[t]he purchase of one ticket directly using an online ticketing system freely available via the Internet from a general purpose computer, without the use of any dedicated resident ticket vending software on such computer, providing such system includes the Subject Functionality." CEATS' Standard Licensing Rates [Dkt. # 38-34]; *see also* Agreement [Dkt. # 38-5] ¶ 1.13 (defining "Transaction" to have "the meaning set forth in CEATS' Standard Licensing Rates for Licenses Under the Patent Portfolio Held by CEATS, Inc."). "Subject Functionality" means "[f]unctionality in a system or method that provides (i) an interactive seat map and (ii) additional information or an additional display of information in response to user interaction with the display of seats in such seat map by placing a mouse indicator

over the seat map." CEATS' Standard Licensing Rates [Dkt. # 38-34]; Agreement [Dkt. # 38-5] ¶ 1.10 (defining "Subject Functionality" to have "the meaning set forth in CEATS' Standard Licensing Rates for Licenses Under the Patent Portfolio Held by CEATS, Inc.").

The functionality at issue concerns TicketNetwork's web interface that allows a user to purchase tickets on-line. In the image below, which is exemplary only, the interface (everything inside the red dashed line) includes an available ticket listing panel (blue) on the left side that is populated by a listing of sections with available seats. The right side of the interface (green dashed line) is a venue diagram providing a display of seats. When a user rolls a mouse icon over a section of available seats in the left (blue) panel, the interface highlights the physical location of those seats in the right venue-diagram panel.



The parties' main dispute concerns the meaning of "seat map" in the definition of Subject Functionality and how it applies to this layout. TicketNetwork contends the "seat map" is limited to the right panel—what CEATS calls the "venue diagram"—and the

"display of seats" is the collection of seats composing the seat map along with any other elements of the event venue, such as the concert stage. Defs.' Summ. J. Reply [Dkt. # 147] at 5 n.3. CEATS agrees the "display of seats" makes up the venue diagram map and that it is separate from the available ticket list. Pl.'s Resp. to Defs.' Mot. for Summ. J. [Dkt. # 138] at 7 ("On the right-hand side of the interface . . . is a dynamic venue diagram providing a display of seats."); Pl.'s Sur-Reply [Dkt. # 156] at 1 ("A 'display of seats' is a subset of the larger phrase 'seat map' . . . ."). But CEATS contends the "seat map" is the entire interface (in this example, everything within the red dashed line), including the available ticket list within the left panel.

TicketNetwork summarizes the parties' positions with this graphic:



Defs.' Mot. for Summ. J. [Dkt. # 112] at 24.

There are also some secondary issues particularly relevant to the present motion. For one, TicketNetwork claims sales made through its call center are not "Transactions" under the Agreement. *Id.* at 27. TicketNetwork also claims ticket sales made by a user on

its mobile platform cannot qualify as Transactions. *Id.* CEATS claims certain ticket purchases constitute two Transactions. CEATS's 2d Supp. Discl. [Dkt. #112-6] at 2 ("Because each ticket sold through TicketNetwork's POS and Mercury products involves a purchase of a ticket from inventory and then a corresponding sale, each ticket represents two transactions for purposes of calculating the royalty payment due to CEATS . . . ."). Thus, if TicketNetwork is found to have breached the Agreement, resolution of these secondary issues will impact the amount of damages.

CEATS and TicketNetwork retained Robert McSorley and Keith Ugone, respectively, as their damages experts. On September 22, CEATS served McSorley's initial report on damages. On October 16, TicketNetwork served Ugone's rebuttal report.[1] Expert discovery closed on October 27.

On November 29, CEATS served McSorley's Supplemental Report [Dkt. #191], which is the subject of CEATS's motion. The Supplemental Report contains 13 sections. TicketNetwork does not oppose leave as to most of the Supplemental Report. TicketNetwork objects, however, to two sections of the report—Section 9 and Section 11— as improper surrebuttal.

Section 9 is entitled "Evidence of Enablement of the Subject Functionality." McSorley Supp. Rep. [Dkt. #191] at 15. In that section, McSorley identifies four events that allegedly illustrate interactive functionality between the seat map and the ticket group

---

[1] The Court has not found either McSorley's initial report or Ugone's rebuttal report in the record.

listing. *See, e.g.*, *id.* at 16 (noting a May 3, 2012, image from a TicketNetwork website relating to a professional football game "illustrates the interactive functionality between the seat map and the ticket group list when the curser is position over the ticket group listing"); *see also id.* at 17–20 (concluding similarly for 3 other events).

Section 11, which is titled "Evaluation of the Ugone Report," criticizes Ugone's rebuttal as "contrived." *Id.* at 28. McSorley also criticizes Ugone for improperly excluding ticket sales from orders placed through mobile devices and for cancelled events, *id.* at 28–32, for failing to recognize that certain orders are two Transactions, *id.* at 33, and for failing to consider prejudgment interest, *id.* at 34.

TicketNetwork complains Section 9 and Section 11 constitute improper sur-rebuttal and include new information. Concerning Section 9, TicketNetwork complains McSorley addresses use of the Subject Functionality, which concerns liability rather than damages calculations. As for Section 11, TicketNetwork asserts McSorley surrebuts Ugone's report and methodologies. *See* Defs.' Resp. [Dkt. # 184] at 5–8.

CEATS replies that Section 9 and Section 11 are proper supplementation. In Section 9, says CEATS, McSorley merely provides the factual bases for his damages calculation. CEATS's Reply [Dkt. # 199] at 4. Section 11 simply outlines damages calculations during certain time periods and the reasons why Ugone's calculations are incorrect. *Id.* at 5. As for timing of the Supplemental Report, CEATS blames TicketNetwork for late production and non-cooperation. *Id.* at 2. Thus, CEATS urges the Court to grant leave to serve the Supplemental Report in its entirety.

## II.     APPLICABLE LAW

Parties must provide their expert disclosures "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). This requirement extends to "designating rebuttal experts and disclosing rebuttal reports intended solely to contradict or rebut evidence in another party's expert reports." Fed. R. Civ. P. 26(a)(2)(D)(ii). Rule 26, however, does not address the availability and timing of surrebuttal.

Clearly, properly characterizing the various reports is key to resolving CEATS's motion. An "initial," "affirmative," or "opening" report is one that contradicts an expected portion of the opposing party's case. *See Morgan v. Commercial Union Assurance Cos.*, 606 F.2d 554, 556 (5th Cir. 1979) ("[A] defense witness whose purpose is to contradict an expected and anticipated portion of the plaintiff's case in chief can never be considered a 'rebuttal witness,' or anything analogous to one."). A "rebuttal" report explains, repels, counteracts, or disproves evidence of the adverse party's initial report. *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 749, 759 (8th Cir. 2006) ("The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party."). A "supplemental" report adds to a previously-served report without going beyond the opinions expressed in the report and without using information available prior to the deadline for service of the supplemented report. *See Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 569–71 (5th Cir. 1996) ("The purpose of rebuttal and supplementary disclosures is just that—to rebut and supplement."); *Simmons v. Johnson*, No. 06-325-A-M2, 2008 WL 474203, at *2 (M.D. La. Feb. 14, 2008) (noting "[c]ourts have routinely

rejected untimely 'supplemental' expert reports and testimony where the opinions are based upon information available prior to the deadline for service of initial expert reports").

Regardless of the character of a report, Rule 37 sets the consequences of untimely or insufficient disclosure by a party: "[T]he party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). When determining substantial justification or harm, courts considers (1) the importance of the witness's testimony; (2) the prejudice to the opposing party of allowing the witness to testify; (3) the possibility of curing any such prejudice by a continuance; and (4) the explanation, if any, for the party's failure to comply with the discovery order or rules. *See Sierra Club*, 73 F.3d at 572 (citing *Bradley v. United States*, 866 F.2d 120, 125 (5th Cir. 1989)).

## III. DISCUSSION

### A. Section 9

Section 9 is neither supplementation nor rebuttal. Although CEATS claims Section 9 simply provides the context for McSorley's damages calculations, the section critiques Ugone's rebuttal report for the alleged failure to consider four events in his damages analysis. Such a critique is not necessary to supplement McSorley's prior damages calculations, and any such "context" should have been included in McSorley's initial report given the information was available prior to the initial-report deadline. Moreover, Section 9 concerns the underlying issue of use of the Subject Functionality, which is different than the damages opinion for which McSorley was retained.

Because Section 9's disclosures are untimely affirmative disclosures, the Court must decide whether CEATS's failure to disclose Section 9's information earlier was substantially justified or harmless. Clearly, Section 9 is important to CEATS, as the Court previously precluded CEATS from filing an affirmative expert report addressing use of the Subject Functionality by TicketNetwork. *See* Hr'g Tr. (Nov. 2, 2017) [Dkt. # 133] at 65:17–18. Because of that preclusion, CEATS has no expert to testify about key aspects of its case-in-chief. But just as clearly, TicketNetwork would be greatly prejudiced if the Court were to grant leave, and a continuance would greatly undermine the Court's trial schedule and is impractical at this stage of the proceeding.

Most significantly, however, CEATS has no good explanation for its delay in proffering this new information, which was available well before the deadline for its initial expert reports. CEATS blames TicketNetwork for slow production and lack of cooperation, CEATS is not blameless. This case began in 2015, yet only recently has CEATS approached the Court for assistance with discovery matters, each time accusing TicketNetwork of gamesmanship and delay. The record, however, shows CEATS has not been diligent in pressing its claims over the last two years. *See generally* H'rg Tr. [Dkt. # 133] at 42:16–65:18. In light of that lack of diligence, the Court is not persuaded CEATS's assignment of blame to TicketNetwork is justified.

In short, Section 9 is best classified as a late affirmative disclosure on TicketNetwork's alleged use of the Subject Functionality. Because the *Sierra Club* factors collectively weigh against leave, the Court will deny CEATS's motion as to this section.

### B. Section 11

In Section 11, McSorley criticizes certain approaches used by Ugone in his rebuttal report, but does not rely on new information to support those criticisms. Thus, the Court considers Section 11 rebuttal to "affirmative" portions of Ugone's report. And as rebuttal, Section 11 should have been served by November 16. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii). CEATS waited until November 29.

Nonetheless, the Court will grant leave as to Section 11 (with some exceptions noted in the next paragraph) in part because service was not egregiously late under Rule 26. Regardless of whether CEATS met the 30-day requirement of Rule 26, CEATS's delay was not the difference between serving Section 11 before or after the October 27 close of expert discovery. Also, the Court sees no prejudice to TicketNetwork from Section 11 given the general nature of the rebuttal. Thus, considering the *Sierra Club* factors collectively, leave should be granted for most of Section 11.

CEATS is denied leave, however, as to the following portions of Section 11:

(1) Page 28, 3d paragraph, last sentence (relying on Section 9);

(2) Page 29, 3d paragraph: "as well as the evidence set forth in Section 9 above";

(3) Page 32, 1st full paragraph (addressing what constitutes Subject Functionality);

(4) Page 33, 1st full paragraph and 3d full paragraph (addressing what constitutes Subject Functionality); and

(5) Section 11.5 in its entirety (addressing future ticket sales).

## IV.  CONCLUSION AND ORDER

The Court **GRANTS** CEATS, Inc.'s Motion for Leave to Serve the Supplemental Expert Report of Robert McSorley [Dkt. # 160] **IN PART**. Specifically, the Court **GRANTS** the motion as to all sections of the Supplemental Report *except* Section 9 and the portions of Section 11 identified above.

**SIGNED this 17th day of January, 2018.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE