IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| CEATS, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:15-CV-01470-JRG |
| | § | |
| TICKETNETWORK, INC.,  TICKET | § | |
| SOFTWARE, LLC, | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

The Court held a show cause hearing on January 22, 2021, wherein the Court received evidence and heard argument related to Defendants TicketNetwork, Inc. and Ticket Software, LLC's (together, "TicketNetwork") Motion for Order to Show Cause Why CEATS or Others Should Not Be Sanctioned for Violation of Protective Order (the "Motion for Sanctions"). (Dkt. No. 349). Having considered the totality of the record, including the evidence submitted at the show cause hearing, the Court now issues this Opinion and **GRANTS** TicketNetwork's requests for relief, as set forth herein.

## I.     BACKGROUND

This is an action arising under the patent laws of the United States and under Texas state contract law. (Dkt. Nos. 1, 26). At the agreement of the parties, the Court entered a protective order on August 3, 2017. (Dkt. No. 72). Prior to trial, the Court held several discovery hearings addressing the production of a particular document, designated TN002528, containing a list of TicketNetwork's website affiliates. (Dkt. Nos. 104, 130). The Court ultimately ordered production of the website affiliate list, subject to a certification that any attorneys who viewed the document

would not engage in any licensing on behalf of CEATS for one year (the "Licensing Bar"). (Dkt. No. 119 at 54:17–22; Dkt. No. 133 at 73:8–10).

This case proceeded to trial in January of 2018. On the sole remaining count at that time, the jury returned a verdict finding that TicketNetwork breached an agreement with Plaintiff CEATS, Inc. ("CEATS"). (Dkt. No. 273). During the post-trial briefing phase, however, potential violations of the Court's protective order came to light, and TicketNetwork moved for an order to show cause why CEATS should not be sanctioned. (Dkt. No. 349).

TicketNetwork sought sanctions after CEATS's CEO, Milford Skane, had somehow obtained the TN002528 TicketNetwork affiliate list and sent it in an email to TicketNetwork's CEO, Don Vaccaro, as the "starting point" for an "8-figure . . . global settlement." (Dkt. No. 349 at 5–6). TicketNetwork moved for relief in the form of (1) additional discovery; (2) a digital forensic investigation, at CEATS's expense, of all hard drives and mobile phones of persons involved in the alleged breach; (3) extension of the Licensing Bar to CEATS as an entity and to any individual who viewed the affiliate list; and (4) attorneys' fees, expenses, and costs. (Dkt. No. 349 at 2).

An initial hearing on the Motion for Sanctions was held on April 30, 2019. (Dkt. Nos. 363, 364). After consideration, the Court granted TicketNetwork's motion in part and carried the remainder. (Dkt. No. 371). The Court ordered additional discovery into the alleged breach of the protective order, ordered a forensic investigation at CEATS's expense, and carried TicketNetwork's requests for substantive relief. (Dkt. No. 371).

The Court appointed two forensic examiners to serve as the Court's neutral experts: Neil Broom and Digital Discovery, Inc. ("Digital Discovery"). (Dkt. Nos. 379, 390). Mr. Broom was appointed to conduct the investigation into Ms. Sonja McAuliffe, Mr. Peter Cook, and Mr. Jeff

2

Moorad. Ms. McAuliffe was a consulting expert retained by CEATS while Messrs. Moorad and Cook were CEATS associates. Digital Discovery was appointed to conduct the investigation into Mr. Skane and Dr. Brian Billett, another CEATS consulting expert. (Dkt. No. 390). Such forensic investigations took considerable time and effort. After the forensic investigation concluded, the Court received briefing from the parties (Dkt. Nos. 406, 409, 410, 413) and set this matter for a show cause hearing (Dkt. Nos. 419, 428). The Court held the show cause hearing on January 22, 2021. (Dkt. Nos. 431, 435).

The Court, having considered the totality of the evidence, concludes that there were several violations of the protective order by Mr. Skane, Ms. McAuliffe, and Dr. Billett. The Court further concludes that CEATS violated the protective order acting through its agent, Mr. Skane, whose violations were an exercise of both actual and apparent authority. The Court is persuaded that this record evinces (at least) a pattern of reckless disregard for the Court's protective order, and for this reason, the Court agrees that the relief requested by TicketNetwork is just and appropriate. For the reasons stated below, the Court will extend the Licensing Bar to CEATS, Mr. Skane, Ms. McAuliffe, and Dr. Billett for thirty (30) months from the date of this Order. The Court will further award TicketNetwork reasonable attorneys' fees, costs, and expenses incurred in connection with prosecuting this Motion for Sanctions, jointly and severally chargeable against the aforementioned parties.

## II.     LEGAL STANDARD

### A.     Sanctions

"If a party or a party's officer, director, or managing agent--or a witness designated under Rule 30(b)(6) or 31(a)(4)--fails to obey . . . an order under Rule 26(f) . . . , the court where the

3

action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2).[1] Protective orders are among those orders contemplated by this rule. *See* Fed. R. Civ. P. 26(f)(3)(D)–(F).  The Court "has broad discretion under Rule 37(b) to fashion remedies suited to the misconduct." *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990). The most severe sanctions typically require a finding of bad faith or willful misconduct. *Id.* at 1021. "'Bad faith' is characterized by conduct that is either intentional or in reckless disregard of a party's obligation to comply with the protective order." 6 MOORE'S FEDERAL PRACTICE, § 26.108 (3d ed.). In addition, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(c).

The Court also possesses inherent authority to impose sanctions "in order to control the litigation before it." *Positive Software Sols. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) (quoting *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 703 (5th Cir.1990), *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)). The Court may use its inherent authority to sanction conduct that is "in direct defiance of the sanctioning court" or constitutes "disobedience to the orders of the Judiciary." *Id.* (quoting *Chambers*, 501 U.S. at 44; *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 989 F.2d 791, 794 (5th Cir. 1993). Inherent authority sanctions may be issued "only if essential to preserve the authority of the court." *Id.* (quoting *Natural Gas Pipeline Co., of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996).

---

[1] CEATS is a "party" and Mr. Skane is a "party's officer." While Ms. McAuliffe and Dr. Billett do not fall within any of the categories listed in Fed. R. Civ. P. 37(b)(2), they have expressly submitted to the Court's jurisdiction, including its authority to issue sanctions, by signing on to the protective order in this case. *See infra* subpart II(B).

### B.      The Agreed Protective Order

The protective order limits the designation of "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY"[2] to documents where the producing party "believes in good faith that the Material constitutes or discloses extremely sensitive 'Confidential' Information" or for which "the unrestricted disclosure . . . would create a substantial risk of serious injury, including, but not limited to information which is pricing or cost information relating to commercial products or planned commercial products, or technical and research information that is highly sensitive." (Dkt. No. 72 ¶ 3). Such designation expressly includes "highly sensitive . . . customer lists." (*Id.*). Absent special permission, access to materials bearing such designation is limited to the Court and its staff, outside counsel of record, court reporters and videographers, outside experts and consultants, jury consultants and vendors, certain deponents, and witnesses. (*Id.* ¶ 6). Access is strictly prohibited to in-house representatives and other persons "who exercise competitive decision-making authority on behalf of a Party." (*Id.*).

Outside experts and consultants are required to sign an appendix to the protective order agreeing to be bound by the same. (*Id.* ¶ 5(e); *see* Dkt. No. 72 Ex. A). In signing said appendix, outside experts and consultants "agree to comply with and be bound by the provisions of the Stipulated Protective Order"; acknowledge that "any violation of the Stipulated Protective Order may subject [them] to sanctions by the Court, civil liability, criminal liability, or any combination of the above"; and "submit [themselves] to the jurisdiction of the United States District Court for the Eastern District of Texas for the purpose of enforcing or otherwise providing relief relating to the Protective Order." (*Id.*).

---

[2] The term "highly confidential" as used in this Order should be understood as a shorthand for "Highly Confidential – Outside Counsel Eyes Only" as defined in the protective order.

The protective order imposes certain duties on persons permitted to receive highly confidential documents. "Any person in possession of Materials that have been designated as . . . 'HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY' shall exercise reasonable and appropriate care with regard to the storage, custody, or use of such Materials to ensure that their confidential nature is maintained. No person receiving such Materials shall, directly or indirectly, transfer, disclose, or communicate in any way the Materials or the contents or information of the Materials to any person other than those [permitted under the Protective Order]." (*Id.* ¶ 10).

## III.   DISCUSSION[3]

### A.    The Court Orders Production of The TicketNetwork Affiliate List

The Court held a discovery hearing on October 23, 2017, addressing several matters including TicketNetwork's affiliate list. (Dkt. Nos. 104, 119). At this first discovery hearing, the Court ordered TicketNetwork to produce the list of affiliate website names and addresses, but required CEATS and its attorneys to "certify in writing to TicketNetwork that those [attorneys' eyes only] documents won't be viewed by attorneys who are identifying or targeting licensing prospects." (Dkt. No. 119 at 54:17–22).

At a subsequent hearing, counsel for CEATS raised a dispute over the temporal limitation on the Licensing Bar. (Dkt. No. 133 at 71:2–72:18). TicketNetwork contended that a longer Licensing Bar, two years in length, was warranted. CEATS contended that a one-year bar on licensing for those attorneys who viewed the TicketNetwork website list was sufficient and stressed that it "will absolutely comply with the protective order." (Dkt. No. 133 at 71:2–72:18). On those representations, the Court ordered immediate production of the website list, subject to a

---

[3] To the extent required by the Federal Rules of Civil Procedure, subparts III(A)–(E) constitute findings of fact and subparts III(F)–(G) constitute conclusions of law.

one-year Licensing Bar. (Dkt. No. 133 at 73:8–10). The Court noted that "if [it] thought [the affiliate list] was something that [CEATS] might have an improper motive to get, [the Court] would be more inclined to give [TicketNetwork] something more extensive." (Dkt. No. 133 at 74:6–9). In response to questions regarding retention of work product making reference to the affiliate websites, Mr. David Affeld, then-counsel for CEATS[4] reassured the Court that "the concern that TicketNetwork has about what [he] would do with work product to circumvent the business relationship that TicketNetwork has with its customers is not a real concern." (Dkt. No. 75:4–7).

The TicketNetwork affiliate website list was ultimately produced as a spreadsheet bearing Bates Number TN002528. (Dkt. No. 349-7). TN002528 was produced in an encrypted, password-protected .ZIP file and bore the designation "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY." (*Id.*).

**B.    Mr. Skane Requests the TicketNetwork Affiliate List and Sends it to Mr. Vaccaro**

On or about January 11, 2019, Mr. Skane requested from Ms. McAuliffe a "non-confidential" TicketNetwork affiliate list in preparing to send a settlement demand to TicketNetwork. (Dkt. No. 435 at 39:14–40:3, 65:11–15, 76:8–13). Ms. McAuliffe responded by sending Mr. Skane a copy of TN002528. (Hr'g Ex. TN13; Dkt. No. 435 at 39:14–40:3). The version of TN002528 that Ms. McAuliffe sent to Mr. Skane had the confidentiality designation removed. (Dkt. No. 435 at 39:25–40:1). Mr. Skane later made a similar request of Dr. Billett for a "non-confidential" TicketNetwork affiliate list. (Dkt. No. 435 at 155:22 – 156:215; Dkt. No. 406-2).

---

[4] At present, Mr. Affeld no longer represents CEATS and only represents Mr. Skane, Ms. McAuliffe, and Dr. Billet in their individual capacities.

On January 23, 2019, Mr. Skane sent an email to TicketNetwork CEO Don Vaccaro with the subject "Settlement." Mr. Skane wrote as follows:

> Don:
>
> We both know the sites involved (attached) and what the numbers are. These can certainly be our starting point. As previously indicated, I am willing to discount past claims and future royalties reasonably. For guidance purposes, as Jeff Moorad has relayed to Mike Honeyman, we are willing to consider an 8-figure (not $99m, but not $10m either) global settlement for any and all TicketNetwork owned affiliates. My view is that a settlement must include a specific agreement for 2017, 2018, 4 months of 2019, and future usage rights through 2023.
>
> Jeff and I can meet you in Boston on Jan. 28th or February 1st at the TAJ on Newbury Street. Alternatively, we can meet in Southern California Feb. 11, 12, 14, or 15. Let me know if getting together to see if we can agree to a settlement would be productive. I look forward to meeting under different circumstances than before with more productive results.
> Thank You
>
> Milford

(Hr'g Ex. TN20; Dkt. No. 349-10). Attached to that email was TN002528, the TicketNetwork affiliate website list. (*Id.*). The email was sent from Mr. Skane's CEATS email address (mskane@ceatsticketing.com) to Mr. Vaccaro's TicketNetwork email address (don@ticketnetwork.com).

Mr. Skane submitted a declaration for CEATS's opposition to the Motion for Sanctions. (Dkt. No. 354-2). In the declaration, Mr. Skane admitted that he requested a list of websites owned by TicketNetwork from Ms. McAuliffe. (*Id.* ¶ 4). However, Mr. Skane also declared that he never read TN002528 and never saved the document to any electronic storage device. (*Id.* ¶ 5).

As the first hearing on the Motion for Sanctions, Mr. Skane maintained that he never opened TN002528 after receiving it. In response to direct questioning from the Court at the first evidentiary hearing, Mr. Skane testified:

THE COURT: Did you open the attachment that came to you from Ms. McAuliffe and look at it at all before you sent it to Mr. Vaccaro?

THE WITNESS: No, sir, I didn't.

THE COURT: You never opened it?

THE WITNESS: I never -- I never opened it and looked it. Did I ever click something when I copied it on there? I don't know how that -- I remember seeing it, so, no –

THE COURT: But you never opened the attached file and looked at the contents of it; is that what you're telling me?

THE WITNESS: That's what I'm saying, sir. That's what I remember.

(Dkt. No. 364 at 49:2–15; *see also id.* at 5:14–21).

At the show cause hearing, Mr. Skane testified that what he received did not have a confidentiality marking on it. Mr. Skane testified that he now understands he was prohibited from seeing it. (Dkt. No. 435 at 40:4–6). Mr. Skane further testified that he specifically requested a "non-confidential list" because he "knew it was a big thing [he] wasn't supposed to see confidential, and [he] didn't want to break a rule." (Dkt. No. 435 at 65:13–18).

Mr. Skane also admitted that he forwarded TN002528 to two CEATS associates, Jeff Moorad and Peter Cook, who were responsible for license negotiations on behalf of CEATS. Neither Mr. Moorad nor Mr. Cook are permitted to view TN002528 under the protective order. Mr. Skane maintained at the show cause hearing that his receipt and distribution of protected material, though a violation of the protective order, was accidental. (Dkt. No. 435 at 40:23–18). He also maintained that he did not open TN002528. (Dkt. No. 435 at 40:19–23).

The Court's forensic investigator, however, found evidence that TN002528 was opened and saved on Mr. Skane's computer. First, as noted in Digital Discovery's expert report (Hr'g Ex. TN2, Dkt. No. 406-3), and as Digital Discovery's representative testified in Court (Dkt. No. 364 at 175–77), a "LNK" file associated with TN002528 was located on Mr. Skane's computer. (Hr'g

Ex. TN2 at 2; Dkt. No. 364 at 176:6–18). Digital Discovery's representative explained that "when a user clicks on a file on a computer, this LNK file, a shortcut is created. It contains information about the file, the actual metadata, not the file data itself. It contains the file name, original file location, and the dates of the file." (Dkt. No. 364 at 176:8–12). As the Digital Discovery report further explains, LNK files can persist even if the underlying file itself is deleted or is stored on removable or network storage. (Hr'g Ex. TN2 at 2; Dkt. No. 364 at 182:12–19). In this case, the LNK file led Digital Discovery to conclude that TN002528 "was saved locally on the C drive on the desktop" on January 23, 2019. (Dkt. No. 364 at 183:3–7; Hr'g Ex. TN2 at 2).

Second, Digital Discovery located two copies of TN002528 on Mr. Skane's desktop computer as temporary or "temp" files associated with the email application Outlook. (Dkt. No. 364 at 176:3–5; Hr'g Ex. TN2 at 2). Digital Discovery explained that "if attachment is sent via email and somebody is using Outlook to open the attachment directly from Outlook, it first saves it to a temporary location of Outlook on the computer, and then it opens." (Dkt. No. 435 at 176:22–25). As explained in the Digital Discovery expert report, the temp files "are identical and contain 'TN 002528' in the file name, but have different hashes"—*i.e.*, digital fingerprints—"than the original TN 002528.xls file." (Hr'g Ex. TN2 at 2).

Digital Discovery explained that the temp files have January 11, 2019 creation dates, leading Digital Discovery to conclude that TN002528 was "double-clicked" in Outlook and opened on Mr. Skane's computer on January 11, 2019. (Dkt. No. 435 at 177:1–21). Digital Discovery further explained that the temp files listed Sonja McAuliffe as the "last author," leading Digital Discovery to conclude that it was Ms. McAuliffe who last saved the file before it was opened in Outlook on Mr. Skane's computer. (Hr'g Ex. TN2 at 2). Digital Discovery concluded

that this evidence was consistent with Ms. McAuliffe having emailed TN002528 to Mr. Skane on January 11, 2019.

No emails from either Ms. McAuliffe or Dr. Billett to Mr. Skane were found in Digital Discovery's investigation of Mr. Skane's email account. (Hr'g Ex. TN2 at 2; Dkt. No. 435 at 177:22–178:13).  In fact, very few emails were found at all during the relevant timeframe: Mr. Skane had, by his own admission, deleted "approximately a month of emails" from that timeframe. (Dkt. No. 354-2 ¶ 11; Dkt. No. 364 at 39:14–40:19; Dkt. No. 435 at 45:17–46:7).   Digital Discovery found a total of seven emails in Mr. Skane's account between January 4, 2019 and February 12, 2019. (Hr'g Ex. TN2 at 2–3; Dkt. No. 435 at 178:5–13). In contrast and for reference, during previous and future months Mr. Skane's account had anywhere from 200 to 400 emails. (Dkt. No. 435 at 178:5–13). Digital Discovery concluded that this is characteristic of deletion activity. (Hr'g Ex. TN2 at 3).

The record—and Mr. Skane's own testimony—is somewhat equivocal as to whether Mr. Skane deleted the emails of his own accord or at the instruction of counsel. (Dkt. No. 364 at 39:3–46:14; Dkt. No. 435 at 46:19–47:6). He indicated that he was told that he should not have a copy of TN002528 and that he deleted it on his own, and by the time he received a formal instruction from counsel to delete the document it was already gone. (Dkt. No. 364 at 42:4–43:15; Dkt. No. 435 at 46:11–14).   Mr. Skane also testified that, in effect, he was told to delete the TN002528 file but was himself responsible for the method and manner of deletion, including "just wiping the whole thing out for three to four weeks' worth of emails." Mr. Skane acknowledge that the deletion was "overkill." (Dkt. No. 435 at 71:3–72:25).

In addition to the January 11, 2019 email from Ms. McAuliffe to Mr. Skane, the forensic investigation revealed a transmission of TN002528 from Dr. Billett directly to Mr. Skane, with

Ms. McAuliffe copied. (Hr'g Ex. TN6). Also copied was Mr. David Affeld, counsel for CEATS at the time.[5] The email was discovered by Mr. Broom's investigation of Ms. McAuliffe. The subject of the email was "TN affiliates: non-confidential copy." Dr. Billett wrote: "Hi Milford – per your request. The attached copy is not marked confidential and contains none of our work product. – Brian." (Hr'g Ex. TN6). Attached to the email was a file named "TN 002528 ticket network affliates.xlsx." Based on the included metadata, Mr. Broom concluded that Dr. Billett emailed Mr. Skane a copy of TN002528 on January 23, 2019. (Dkt. No. 435 at 35:9–19).

Based on the foregoing, the Court finds that Mr. Skane requested a list of TicketNetwork affiliates from Ms. McAuliffe, received TN 002528 from Ms. McAuliffe by email on January 11, 2019, and opened, downloaded, or saved TN 002528 onto his computer. The Court also finds that Mr. Skane requested a list of TicketNetwork affiliates from Dr. Billett, received TN 002528 from Dr. Billett by email on January 23, 2019, and opened, downloaded, or saved TN 002528 onto his computer a second time.

The forensic investigation also revealed that Mr. Skane transmitted the report of damages expert Robert McSorley to a Mr. Terry McEwen. (Dkt. No. 435 at 178:14–24). On September 27, 2017, Mr. Skane used his CEATS email account to send several files—including "R McSorley Report.pdf" to Mr. McEwen. (Hr'g Ex. TN4). The McSorley report is designated as highly confidential. (Hr'g Ex. TN5). Mr. Skane testified that he did not remember what the McSorley report was or whether he read it, saw it, or sent it to anyone. (Dkt. No. 435 at 66:19–67:8).

### C.    Mr. Skane and CEATS Violated the Protective Order

Mr. Skane was prohibited from receiving either TN002528 or the McSorley damages report. Both items were designated "Highly Confidential – Outside Counsel Eyes Only." Mr.

---

[5] No other counsel for CEATS was copied.

Skane, as an executive of CEATS, exercises competitive decisionmaking authority on behalf of CEATS, and was therefore prohibited from viewing such documents.

The Court finds that Mr. Skane violated the protective order. First, the Court finds that Mr. Skane violated the protective order's direct prohibition on transmitting, disclosing, or communicating materials designated highly confidential to persons who are not entitled to view such materials. These violations include, at a minimum, transmitting TN002528 to Jeffrey Moorad and Peter Cook and transmitting the McSorley damages report to Terry McEwen.

Second, the Court finds that Mr. Skane failed to observe the duty of care mandated by the protective order. The protective order mandates "reasonable and appropriate care with regard to the storage, custody, or use of such Materials to ensure that their confidential nature is maintained." (Dkt. No. 72 ¶ 10). Mr. Skane recklessly disregarded the protective order and its mandates. Mr. Skane knew that the type of information he was requesting could be confidential. In requesting the lists from Ms. McAuliffe and Dr. Billett for the purpose of making a settlement demand—and specifically, in requesting "non-confidential" versions—Mr. Skane consciously disregarded a risk that he would receive and transmit information that was in fact highly confidential. The Court also views Mr. Skane's overbroad deletion of his emails and insistence that he did not view TN002528 (despite forensic evidence otherwise) as probative of Mr. Skane's awareness of this risk.

The Court further finds that Mr. Skane was acting within the course and scope of his employment as CEO of CEATS when he violated the Protective Order. Mr. Skane's transmission of the document to colleagues Mr. Moorad and Mr. Cook and TicketNetwork's CEO, Mr. Vaccaro, was for the purpose of settling existing litigation between the two parties. Mr. Skane was clearly exercising his authority as CEATS's CEO to negotiate settlements. *See Paragon Indus. Applications, Inc. v. Stan Excavating, LLC*, 432 S.W.3d 542, 549 (Tex. App.—Texarkana 2014,

no pet.) (actual authority). Additionally, Mr. Skane used his CEATS email address to transmit TN002528 and thereby held himself out to Mr. Vaccaro as acting on behalf of CEATS. *Id.* at 549–50 (apparent authority). Mr. Skane was acting as an agent of CEATS when he violated the protective order. Therefore, the Court finds that CEATS violated the protective order. *See Shaw v. Kennedy, Ltd.*, 879 S.W.2d 240, 246 (Tex. App.—Amarillo 1994, no writ) ("It is well settled that a principal is liable for the acts of its agent; what a principal does through an agent, he does himself.").

### D. Ms. McAuliffe Violated the Protective Order

Sonja McAuliffe is a consulting expert retained by CEATS. (Dkt. No. 435 at 161:24–162:1).  Ms. McAuliffe is a travel and ticketing researcher and analyst. CEATS retained Ms. McAuliffe to review TicketNetwork's websites and determine whether those websites enable certain functionality as defined in the license agreement between CEATS and TicketNetwork. (Dkt. No. 365 at 60:1–62:7). Ms. McAuliffe signed and agreed to be bound by the protective order in this case. (Dkt. No. 435 at 162:2–4).

Ms. McAuliffe testified that her job was to look for potential infringers of CEATS's patents and analyze a potential infringer's underlying technology. (Dkt. No. 364 at 60:19–61:24). Her work began on another legal matter, and by 2017, involved looking for TicketNetwork affiliates. (Dkt. No. 364 at 61:18–20). Ms. McAuliffe testified that she "never ha[d] to deal with Mr. Skane" in this capacity. (Dkt. No. 364 at 60:19, 70:14–22).

In 2017, Ms. McAuliffe received TN002528 by email from Dr. Billett in accordance with her consulting duties for CEATS. The file she received from Dr. Billett did not require a password to open it. Ms. McAuliffe testified she knew TN002528 was designated as highly confidential

14

under the protective order from reading the body of the production email. (Dkt. No. 364 at 64:15–65:25).

In her declaration, Ms. McAuliffe stated that many TicketNetwork documents designated as highly confidential had the label "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY" in the file name, but TN002528 did not. (Dkt. No. 354-1 ¶ 9). She stated she did not note that TicketNetwork had failed to mark the file name with the confidentiality designation. (Dkt. No. 354-1 ¶ 9).

Ms. McAuliffe testified that shortly after downloading TN002528, she changed the file name to "TN002528 TicketNetwork Affiliates" to indicate what the contents of the document were. (Dkt. No. 364 at 66:18–67:21). Ms. McAuliffe acknowledged that she could have renamed the file to include a confidentiality designation, but that she did not do so because her naming convention was purely for her own informational purposes. (Dkt. No. 364 at 68:18–69:18). She acknowledged that this was "careless." (Dkt. No. 364 at 69:7–9).

On January 11, 2019, Ms. McAuliffe received a request from Mr. Skane for a list of TicketNetwork websites and affiliates. She sent him several public links with lists of TicketNetwork websites. (Hr'g Ex. TN13; Dkt. No. 354-1 ¶ 10). She also sent Mr. Skane a copy of TN002528. (Hr'g Ex. TN13; Dkt. No. 354-1 ¶ 10). According to her declaration, Ms. McAuliffe thought TN002528 contained the same information as the public lists. As the file name did not contain a confidentiality designation, Ms. McAuliffe stated that she assumed its contents were not confidential. (Dkt. No. 354-1 ¶ 10). She also testified that she double-checked the file properties before she submitted it to Mr. Skane. (Dkt. No. 364 at 66:11–17). Ms. McAuliffe agreed that she violated the protective order. (Dkt. No. 364 at 77:1–3). She characterized the violation of the protective order as "inadvertent." (Dkt. No. 354-1 ¶¶ 11–12).

15

Ms. McAuliffe further stated that she had deleted all of TicketNetwork's confidential and highly confidential documents, including TN002528, from her personal and work electronic devices. (Dkt. No. 354-1 ¶ 13; Dkt. No. 364 at 75:10–76:25). She also testified that she deleted any related emails with attachments, but that she was not instructed by counsel either to delete them or to preserve them. The Court's forensic investigator, Mr. Broom, later discovered one pertinent email in her possession: the January 23, 2021 email from Dr. Billett to Mr. Skane containing TN002528. (Dkt. No. 435 at 35:9–19). This email was in Ms. McAuliffe's possession because she was copied (along with Mr. Affeld, who was then counsel for CEATS). (Hr'g Ex. TN6; Dkt. No. 435 at 165:3–170:5). Ms. McAuliffe testified that she believed that she had deleted everything. (Dkt. No. 435 at 167:21–23).

The Court finds that Ms. McAuliffe violated the protective order. First, Ms. McAuliffe was prohibited from transmitting TN002528 to Mr. Skane because he was not permitted to view that document under the protective order. Second, Ms. McAuliffe did not exercise due care with respect to the confidential information in her possession. Ms. McAuliffe knew that TN002528 was highly confidential when she received it but did not exercise reasonable care in maintaining possession of the document. In transmitting the document to Mr. Skane, Ms. McAuliffe recklessly disregarded a known risk that she was transmitting "Highly Confidential" materials.

### E.    Dr. Billett Violated the Protective Order

Dr. Brian Billett is a consulting expert retained by CEATS. (Dkt. No. 435 at 101:20–22). Dr. Billett signed and agreed to be bound by the protective order in this case. (Dkt. No. 435 at 101:23–102:5). Dr. Billett has a Ph.D. in electrical engineering. (Dkt. No. 435 at 121:16–18). Dr. Billett works for a car dealership software company called myKaarma. (Dkt. No. 435 at 101:4–9). He also owns a consulting company called Archimedes IP, and he consults as an expert in litigation

and prosecutes patents on behalf of clients through this company. (Dkt. No. 368-1 ¶ 3; Dkt. No. 435 at 101:12–19, 133:8–9). Dr. Billett stated he was retained by CEATS in the present litigation to review TicketNetwork's source code and website functionality. (Dkt. No. 368-1 ¶ 4). He stated the he had previously been retained by CEATS on other unrelated matters. (Dkt. No. 368-1 ¶ 4).

Dr. Billett did not testify at the first evidentiary hearing on the motion for sanctions. After that hearing, Dr. Billett submitted a declaration in support of CEATS's post-hearing letter brief. (Dkt. No. 368-1).  He stated in his declaration that on November 2, 2017, Mr. Affeld forwarded to him a document production email generated by TicketNetwork's counsel containing instructions to download a file called TN015.zip from their FTP server. TN015.zip was a compressed (zipped) folder containing TN002528. Dr. Billett stated that the instructions email indicated that the production was "Highly Confidential – Outside Counsel Eyes Only." (Dkt. No. 368-1 ¶ 7; Dkt. No. 435 at 102:20–103:1). Dr. Billett further explained that the FTP server and the TN015.zip file were password protected. He stated he received the password in a separate email, forwarded to him by Mr. Affeld, along with the instructions in a single email chain. (Dkt. No. 368-1 ¶ 8; Dkt. No. 435 at 103:2–9). According to Dr. Billett, the contents of the zip file (including TN002528) were not themselves encrypted or password protected, and none of the files bore any indicia of confidentiality. (Dkt. No. 368-1 ¶ 8).

Dr. Billett stated that he forwarded the production email to Ms. McAuliffe in November of 2017 via encrypted email. (Dkt. No. 368-1 ¶ 9). He also testified that he shared the TN002528 file with Ms. McAuliffe on a shared drive used for storing documents. (Dkt. No. 435 at 103:10–14). Dr. Billet further stated in his declaration that "[o]ther than counsel, [he] never sent TN 002528 to anyone other than Ms. McAuliffe." (Dkt. No. 368-1 at ¶ 10).

The Court's forensic investigator, Mr. Broom, discovered an email from Dr. Billett to Mr. Skane transmitting TN002528 on January 23, 2019, with Ms. McAuliffe and Mr. Affeld copied. (Hr'g Ex. TN6; Dkt. No. 435 at 35:9–19). Ms. McAuliffe and Mr. Skane corroborated having received this email from Dr. Billett. (Dkt. No. 435 at 44:7–45:12, 165:4–23). At the show cause hearing, Dr. Billett acknowledged that his earlier sworn statement was false. (Dkt. No. 435 at 106:22–107:10). He also testified that Mr. Affeld never told him that he should not have sent this email. (Dkt. No. 435 at 108:6–14).

The January 23, 2019 email was not found among Dr. Billett's email accounts or devices because he—like Mr. Skane and Ms. McAuliffe—had undertaken broad deletions. Dr. Billett was equivocal as to whether he was instructed to make any deletions. (Dkt. No. 435 at 109:12–13). He testified that he was primarily acting on instructions given to Ms. McAuliffe:

> The direction was to -- Ms. McAuliffe, to -- she had to delete all of her TicketNetwork documents. Those documents were all TicketNetwork documents -- we were working on probably four or five TicketNetwork cases, and so it was -- I had helped her separate the correct ones that were being deleted. And since it was on a shared directory, I had to delete them and either preserve them or move them to another location that she would not have access to.

(Dkt. No. 436 at 109:15–22). Dr. Billett testified that he does not specifically recall deleting his January 23, 2019 email to Mr. Skane, explaining that "there were many, many documents being deleted at that time that were related to . . . TicketNetwork in this case." (Dkt. No. 435 at 100:2–4). He also acknowledged that the email to Mr. Skane was not located on the shared directory to which Ms. McAuliffe had access. (Dkt. No. 435 at 110:18–20).

Digital Discovery's representative testified that he collected Dr. Billett's data from his devices on July 11, 2019. (Dkt. No. 435 at 179:4–5). Upon investigation, Digital Discovery learned that two software utilities, CleanManager and CCleaner, had been run on Dr. Billett's laptop the morning of July 10, 2019—the day before. (Dkt. No. 435 at 179:6–8).

18

Digital Discovery's representative explained that CleanManager is a Windows utility for cleaning temporary program files. (Dkt. No. 435 at 179:9–17). As detailed in Digital Discovery's report, CleanManager (CLEANMGR.EXE) was run on July 10, 2019 at 6:14:23 a.m. (Hr'g Ex. TN2 at 3). Digital Discovery's representative explained that CCleaner is "a third-party computer management program to . . . boost the computer performance or to clean the computer for privacy." (Dkt. No. 435 at 179:18–21). He testified it could be used to "clean the temporary files, Internet history registry, or free space or deleted files," with the possible effect of "deleting data and destroying computer forensic artifacts." (Dkt. No. 435 at 178:22–180:11). As detailed in Digital Discovery's report, CCleaner (CCLEANER64.EXE) was run on July 10, 2019 at 7:21:36 a.m. (Hr'g Ex. TN2 at 3). Digital Discovery did not find any instances of TN002528 among Dr. Billett's data, emails, or files. (Hr'g Ex. TN2 at 3; Dkt. No. 435 at 180:12–181:7).

Dr. Billett testified that his reason for running the deletion software was to help sync the files on his laptop with the files on his One Drive cloud-based account. (Dkt. No. 435 at 125:5–126:24). He explained that he wished to provide the forensic examiners with "a complete set of all of the documents that were on the One Drive," but that the syncing process sometimes raised file errors and "mismatches." (*Id.*). He testified that he "ran CCleaner to clean up disk space and correct any mismatch as best [he] could. So . . . the cloud would be . . . correctly synced to the laptop." (*Id.*).

The Court finds this explanation incredulous, especially given Dr. Billett's previous misrepresentations under oath. It was not Dr. Billett's job to "help" the forensic examiners retrieve his data, but merely to allow them to do so uninhibited. Dr. Billett should have presented all of his files as they were, with all electronically stored information preserved. *Cf.* Fed. R. Civ. P. 37(e). Dr. Billett has a Ph.D. in electrical engineering and was retained as a computer source code expert.

19

He was familiar with the ongoing investigation, and his conduct was at the center of it. As a patent agent, Dr. Billett is also familiar with duties of candor to a tribunal. *See* 37 C.F.R. 11.101 *et seq*. Even if his intentions were innocent (which is doubtful), the Court finds it impossible to believe that Dr. Billett did not know how his actions—running deletion software the day before a forensic investigation into his own conduct—would be perceived.

Dr. Billett also admitted to several other instances where he mishandled protected materials. First, Dr. Billett admitted that he copied Mr. Skane on a January 1, 2018 email containing TicketNetwork source code, portions of a deposition transcript, and an excerpt of the expert report of Dr. Thomas Rhyne—all of which are highly confidential under the protective order. (Dkt. No. 435 at 112:19–115:14). Second, on November 9, 2017, Dr. Billett sent a source code analysis to a co-worker of his, Mr. Don Sander, who had not agreed to be bound by the protective order. (Dkt. No. 435 at 117:16–119:21). Third, on November 11, 2017, Dr. Billett sent a draft of a CEATS brief to another co-worker of his, Mr. Doug MacGlashan, who also had not agreed to be bound by the protective order. (Dkt. No. 435 at 115:15–117:15). Dr. Billett claimed he submitted these materials to Mr. MacGlashan and Mr. Sander for "proofreading." (Dkt. No. 435 at 119:8–21). While the Court cannot conclude definitively that these transmissions were *per se* violations of the protective order, the Court views them as demonstrating a pattern of recklessly disregarding the protective order and its mandates.

The Court therefore finds that Dr. Billett violated the protective order in this case. Dr. Billett affirmatively violated the protective when he transmitted the TN002528 spreadsheet and other highly confidential materials to Mr. Skane. Dr. Billett also mishandled protected materials in several instances, which together amount to a reckless disregard of the protective order—and therefore a breach of the duty of care imposed by the protective order. Dr. Billett failed to maintain

20

any indicia of confidentiality with respect to TN002528 and his sharing of the same with Ms. McAuliffe. He also improperly shared with persons not subject to the protective order materials that he either knew were highly confidential or for which he disregarded a substantial risk of confidentiality.

### F.    Extension of the Licensing Bar is Appropriate

The Court "may issue further just orders" to sanction violations of a protective order. Fed. R. Civ. P. 37. As a condition of producing TN002528, the Court previously ordered that any attorneys who viewed the document must certify that they would not engage in any licensing on behalf of CEATS for one year. TicketNetwork now seeks an extension of the Licensing Bar to "CEATS as an entity and any individual who received TicketNetwork's protected information." (Dkt. No. 349 at 2). Sanctions under Rule 37 must be tailored to the violations at issue, and under the circumstances in this case, the Court is persuaded that the relief sought is just and appropriate.

In intellectual property litigation, where outside counsel often gains special access to an opposing party's closely guarded technical specifications and trade secrets, preserving the line between a party and its outside counsel takes on special significance. On one side of the line is the client, who is prohibited from using an opposing party's highly confidential materials and thereby gaining an unfair competitive advantage. On the other side of the line is outside counsel, who is permitted to view these materials for litigation purposes but is thereafter prohibited from doing other work (such as licensing) where the materials could provide such an unfair advantage. The violations at issue in this case blurred the line between a party and outside counsel. CEATS took advantage of this blurred line and attempted to use TicketNetwork's affiliate list to gain unfair leverage in settlement negotiations.

TicketNetwork's corporate representative, Mr. Chris Hummer, testified about the potential competitive and litigation harms associated with improper disclosure of its affiliate list. In the first instance, Mr. Hummer testified that a competitor of TicketNetwork could use the affiliate list to lure away TicketNetwork's business. (Dkt. No. 436 at 7:3–10:18). In the second instance, Mr. Hummer testified that CEATS could potentially use the list to identify patent litigation or licensing targets among TicketNetwork's affiliates and customers. (Dkt. No. 435 at 200:2–17). He also testified that CEATS could use the list to improperly exact settlements, as Mr. Skane attempted to do with Mr. Vaccaro. (*Id.*). Indeed, as Ms. McAuliffe noted, identifying TicketNetwork affiliates was a significant aspect of CEATS's licensing and enforcement strategy.

The Court is of the opinion that subjecting CEATS and the individuals who violated the protective order to the same Licensing Bar as outside counsel is a just sanction. CEATS has already attempted to use TN002528 to gain an unfair settlement advantage. The handling of TicketNetwork's confidential information after this violation came to light is questionable at best. The dissemination of TicketNetwork's affiliate list to persons who should not have viewed it and who did not agree to the protective order is a bell that cannot be unrung. A monetary sanction would simply set a price on violating the Court's protective orders in a manner that could cause irreparable, unquantifiable harm. Other sanctions such as evidentiary presumptions, curative instructions, striking the pleadings, default judgments, and dismissal of claims are unavailable because the violations largely did not occur and were not discovered until after final judgment was entered in this case. (*See* Dkt. No. 331). Moreover, there is significant deterrence value in a sanction of this nature. Counsel and client must work together to police the use (and misuse) of discovery materials. They must also ensure that those who have a need to view highly confidential materials are thoroughly vetted and sign the protective order.

The Court is also persuaded that an extension of the Licensing Bar, from one year to two and a half years, is appropriate. TicketNetwork initially requested a two-year Licensing Bar. In reliance on CEATS's representation that they would "absolutely comply with the protective order," and that the risk of misuse is "not a real concern," the Court concluded that one year was sufficient. (Dkt. No. 133 at 72:6–73:10). As CEATS evidently failed to live up to its promise, a Licensing Bar of **thirty months from the date of this Order** is now appropriate.

### G.    TicketNetwork is Entitled to Reasonable Expenses, Costs, and Attorneys' Fees

As a part of sanctions under Rule 37(b)(2), "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorneys' fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." The Court finds that there are no mitigating circumstances that justify the violations at issue. Accordingly, TicketNetwork is entitled to collect reasonable expenses, costs, and attorneys' fees incurred in prosecuting this protective order violation. Such reasonable expenses, costs, and attorneys' fees shall be chargeable jointly and severally to those who violated the protective order: CEATS, Mr. Skane, Ms. McAuliffe, and Dr. Billett.[6]

## IV.    CONCLUSION

CEATS, Mr. Skane, Ms. McAuliffe, and Dr. Billett violated the protective order, both affirmatively and by recklessly disregarding its mandates. The Court concludes that a thirty-month extension of the Licensing Bar, to run from the date of this Order, as to CEATS as an entity and to Mr. Skane, Ms. McAuliffe, and Dr. Billett in their personal capacities, is a just and appropriate

---

[6] As these violations were largely due to party affiliates running rampant beyond the supervision of counsel, the Court declines to order CEATS's counsel to pay TicketNetwork's attorneys' fees. The Court notes, however, that CEATS's counsel could have done a better job supervising and policing the use of discovery materials before they got into the wrong hands. For example, Mr. Affeld should have informed TicketNetwork's counsel of the breach as soon as he became aware of it on January 11, 2019 when he was copied on the email from Dr. Billett to Mr. Skane.

sanction. The Court further concludes that TicketNetwork is entitled to reasonable attorneys' fees, costs, and expenses related to such violations.

## V.     ORDER

In light of the foregoing, the Court now **GRANTS** the relief requested by TicketNetwork. It is hereby **ORDERED** that the Licensing Bar is extended to CEATS, Mr. Skane, Ms. McAuliffe, and Dr. Billett, and shall apply for a period of **thirty (30) months** from the date of this Order. The Court further **ORDERS AND ENJOINS** that CEATS, Mr. Skane, Ms. McAuliffe, and Dr. Billett are barred from contacting, seeking licensing fees, suing, or seeking damages from or related to TicketNetwork or any of the companies or websites contained in the TN002528 TicketNetwork affiliate list during said thirty month period. Such Licensing Bar shall run to and bind any successors-in-interest of CEATS, Mr. Skane, Ms. McAuliffe, and Dr. Billett.

It is further **ORDERED** that TicketNetwork is awarded reasonable attorneys' fees, costs, and expenses incurred in connection with prosecuting this protective order violation. TicketNetwork shall recover such attorneys' fees, costs, and expenses jointly and severally from CEATS, Mr. Skane, Ms. McAuliffe, and Dr. Billett. TicketNetwork shall submit documentation and a memorandum in support of attorneys' fees, costs, and expenses, not to exceed **seven (7) pages** (excluding exhibits), within **fourteen (14) days** of this Order. CEATS may file a memorandum containing any objections, not to exceed **seven (7) pages** (excluding exhibits), within **seven (7) days** of TicketNetwork's memorandum. Mr. Skane, Ms. McAuliffe, and Dr. Billett may also jointly file a memorandum containing any objections, not to exceed **seven (7) pages** (excluding exhibits), within **seven (7) days** of TicketNetwork's memorandum. No further briefing on this issue will be permitted unless ordered by the Court.

It is further **ORDERED** that Dr. Billett is referred to the Office of Enrollment and Discipline ("OED") of the United States Patent and Trademark Office. The Clerk of Court is directed to furnish a copy of this Order to the OED and to make the record in this case available to the OED upon its request, subject to the existing protective order.

It is further **ORDERED** that CEATS serve this Order upon any person or entity who improperly received materials subject to the protective order in this case, including but not limited to Mr. Skane, Ms. McAuliffe, Dr. Billett, Mr. Cook, Mr. Moorad, Mr. McEwen, Mr. MacGlashan, and Mr. Sander. Such persons and entities are on notice that the Court takes protective order obligations seriously and will exercise its authority as appropriate to address any future or heretofore-undiscovered violations. CEATS shall effect such service within **fourteen (14) days** of this Order and shall file a detailed Notice of Compliance with supporting documentation upon completion of service. CEATS shall bear the costs and expenses associated with such service.

It is further **ORDERED** that the attorneys from Haltom & Doan LLP have leave to re-urge their Motion to Withdraw. (*See* Dkt. No. 442).

CEATS's Motion for an Order Tolling the Applicable Limitations Periods for its Claims Against Defendants Pending the Court's Final Ruling on Defendants' Show Cause Motion (Dkt. No. 444) is **DENIED AS MOOT**.

The Court retains jurisdiction over this case and all persons involved for the purpose of enforcing its Orders.

**So ORDERED and SIGNED this 24th day of August, 2021.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE